IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2017 Session

## STATE OF TENNESSEE v. MARCELLUS WOODS

**Appeal from the Criminal Court for Shelby County**
No. 14-06427     John W. Campbell, Judge

_____

### No. W2016-01527-CCA-R3-CD

_____

The Defendant, Marcellus Woods, was convicted by a Shelby County Criminal Court jury of aggravated robbery, a Class B felony, and was sentenced to eight years in the Tennessee Department of Correction. On appeal, he argues that the trial court erred in allowing testimony under Rule 404(b) of the Tennessee Rules of Evidence concerning his involvement in an attempted robbery of one business and his suspicious activities near another business. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Genna M. Lutz, Memphis, Tennessee, for the appellant, Marcellus Woods.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Fouché and Olivia C. Brame, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The Defendant and two co-defendants were indicted for the aggravated robbery of an employee of the Family Dollar store on Third Street in Memphis that occurred the morning of July 29, 2014. The State filed a motion in limine to admit evidence of other bad acts pursuant to Rule 404(b) of the Tennessee Rules of Evidence, and, after a hearing, the trial court granted the State's motion. The case proceeded to trial.

**State's Proof**

Kimberly Lewis testified that she was working as the store manager of the Family Dollar store on South Third Street in Memphis on July 29, 2014. That morning, as Ms. Lewis unlocked the door to go into the store, two men pushed her in, made her disarm the alarm, and commanded her to get money from the safes. Both of the men had guns, their faces were covered and they were wearing gloves. Ms. Lewis said that the store had two safes, one that housed the register trays and one that was used for bank deposits. Both safes had a time delay before they would open. The men warned Ms. Lewis not to run her hand down the middle of the safe's keypad, a feature on some safes in the company that would alert the police. It appeared to Ms. Lewis that the men were familiar with the layout of the store because they avoided the parts of the store with motion detectors that would set off the alarm. The store's video surveillance system captured the incident. Ms. Lewis estimated that the men stole $3000. During the ordeal, Ms. Lewis feared for her life and believed that she would be killed.

Ms. Lewis testified that Vernicia Stamps, the assistant store manager, was originally scheduled to come in a few hours after Ms. Lewis but had volunteered to come in early to assist Ms. Lewis with some freight. However, Ms. Stamps texted Ms. Lewis that morning to say that she was running late, which was unusual for her. Ms. Lewis knew the Defendant because his mother was a former manager for Family Dollar, and Ms. Lewis was the Defendant's mother's assistant manager. Later, Ms. Lewis hired the Defendant the summer after his senior year of high school before he left for college.

Sergeant Taurus Nolen with the Memphis Police Department investigated the July 29 robbery of the Family Dollar store. He recalled that Ms. Lewis was unable to identify the robbers because they were masked. He viewed the surveillance footage from the store and noticed that the robbers were wearing all black and carrying a backpack. He noticed that their guns were "extremely large," which struck Sergeant Nolen as peculiar. Sergeant Nolen developed suspects in the Family Dollar robbery after the police were called to a cash advance business on August 5, 2014 where suspects had been detained and then released. One of the individuals who had been detained was Demarcio Ross. Sergeant Nolen noticed similarities between the two robberies and wanted to determine if the two crimes were related. He brought Mr. Ross in for questioning and obtained consent to search Mr. Ross's girlfriend's vehicle. The search revealed a paintball gun, which, because of its "abnormally" large size, Sergeant Nolen surmised that it was the gun used in the Family Dollar robbery. After interviewing Mr. Ross and discovering the paintball gun, Sergeant Nolen obtained a warrant for the Defendant's arrest.

Demarcio Ross testified that he and the Defendant robbed the Family Dollar store on South Third Street on July 29, 2014. The Defendant brought up the idea weeks earlier

when they were joking about how they both needed money. They picked that particular Family Dollar store because the Defendant said that his sister worked there. The night before the robbery, the Defendant stayed at the home Mr. Ross shared with his girlfriend, Regina Muhammad. The Defendant was dating Lelia Muhammad, Regina's sister.[1] Mr. Ross and the Defendant awoke around 5:00 or 6:00 a.m. the morning of the robbery. They picked up Jeremy Howard in Regina's car, a blue Saturn, and drove to the Family Dollar where they waited for someone to arrive and unlock the door. Mr. Ross covered his face from his nose down with his shirt, and Mr. Howard covered his entire face. Mr. Ross carried a BB gun, and Mr. Howard carried a paintball gun. The Defendant served as driver and lookout, while Mr. Ross and Mr. Howard entered the store. Once inside, Mr. Ross and Mr. Howard forced the victim to turn off the alarm and open the safes. Mr. Ross was in contact with the Defendant while they waited for the time delay on the safes to elapse. They put an estimated $1700 in a backpack and ran from the store. The Defendant drove them back to Mr. Ross's apartment, and the three men split the robbery proceeds equally.

Mr. Ross testified that on August 5, 2014, he and the Defendant and Mr. Howard attempted to rob a cash advance business, Ace Cash Express. The men developed a plan wherein Mr. Ross went in pretending to be a loan applicant, and the Defendant and Mr. Howard entered and demanded cash, while pretending to hold Mr. Ross hostage. Mr. Ross said that the Defendant and Mr. Howard were both armed with BB guns, which were different from that used in the Family Dollar robbery. The robbery of Ace Cash Express was unsuccessful because the store clerk immediately dropped to the floor and activated the alarm. Mr. Ross stayed at the scene pretending to be a bystander and was eventually arrested for possession of marijuana. Police also found a BB gun in Mr. Ross's car. The Defendant and Mr. Howard ran after the employee signaled for the police, but they later returned to the scene to check on Mr. Ross.

Mr. Ross testified that over a week later, on August 13, 2014, he and the Defendant planned to rob another Family Dollar store in the area of Mary Jane Avenue. They had a BB gun and paintball gun in the trunk of their car for such purpose. They tried to rob the store that morning when it opened, but the door was locked. They returned later that night to try again, but a police officer pulled them over and arrested Mr. Ross for driving on a suspended license.

Jeremy Howard's testimony was essentially consistent with Mr. Ross's testimony regarding the robbery of the Family Dollar store on South Third Street and attempted robbery of Ace Cash Express. Mr. Howard elaborated that the Family Dollar was chosen

---

[1] Because the two women share a surname, we will refer to them by first names at times to avoid confusion. We intend no disrespect with this practice.

because the Defendant had worked there. Mr. Howard also said that the Defendant believed that the only people who were going to be working in the store were "his two sisters," but there ended up being "just one woman." Mr. Howard estimated that they took around $2000 in the robbery.

With regard to the Ace Cash Express attempted robbery, Mr. Howard testified that they chose the location because it was the "closest to us." Mr. Howard's recollection differed from Mr. Ross's in that Mr. Howard recalled that he was armed with a paintball gun, and the Defendant was armed with a BB gun. Mr. Howard also elaborated that he and the Defendant returned to Ace after waiting on Mr. Ross for thirty to forty-five minutes to try "to get [Mr. Ross] out of the situation." He said that officers handcuffed him and the Defendant and put them in a police car, but the officers eventually let them go.

Regina Muhammad testified that the night before the robbery of the Family Dollar store on South Third Street, Mr. Ross was "joking around" and "saying he was going to rob something." The next morning, she woke up and discovered that the Defendant and Mr. Ross were not in the house and that her Saturn automobile was gone. She saw the Defendant, Mr. Ross, and Mr. Howard come into the house with backpacks and later saw them counting money. Ms. Muhammad said that, a few days before, she saw the Defendant and Mr. Ross "messing around with" a BB gun and a paintball gun.

Alisa Styles, the custodian of jail records for the Shelby County Sheriff's Office, testified that the Defendant's inmate record showed that he was booked into the jail on September 3, 2014, and he was visited by Vernicia Stamps on September 4, 2014. Ms. Stamps was the Defendant's first visitor.

Eddie Anderson,[2] a resident of Mary Jane Avenue, testified that early in the morning on August 13, 2014, he noticed a gray or silver four-door car with two young African-American men inside parked in front of his neighbor's house. Almost two hours later, Mr. Anderson saw the two men, dressed in dark clothes, get out of the car and put on black ski masks. Both men were wearing all black, and the passenger had a backpack. The men walked west, toward the "business district" on Elvis Presley Boulevard. There was a Family Dollar store on Elvis Presley Boulevard about a half a mile from where the car was parked. Mr. Anderson called the police. The men returned after five or ten minutes, sat in the car for a short while, and then drove off slowly. Later that evening,

---

[2] Mr. Anderson's testimony from an earlier proceeding was read into the record pursuant to a stipulation by the parties as Mr. Anderson had become unavailable but had testified under oath and was subject to cross-examination at the earlier proceeding.

- 4 -

Mr. Anderson saw the flashing blue lights of a police car in the neighborhood, so he went outside to speak to them and reiterated what he had observed that morning.

Officer Tony Franklin of the Memphis Police Department testified that he responded to a "suspicious person's" call in the area of Mary Jane Avenue and Elvis Presley Boulevard on August 13, 2014, around 8:00 p.m. The caller advised that a gray Saturn, seen in the area earlier that day and "occupied by two subjects with hoodies and gloves on," had returned to the area. Officer Franklin located a vehicle matching the description parked on Mary Jane Avenue with its lights off. The car was facing west, and Officer Franklin was driving east. Immediately after Officer Franklin drove past the car, it turned on its lights and drove away. Officer Franklin turned around, activated his blue lights, and pulled the car over. The car had the same license plate number as the car that had been reported that morning. Officer Franklin discovered that the license of the driver, Mr. Ross, was suspended. The Defendant was also in the car, sitting with a backpack on the floorboard between his legs. Officer Franklin opened the backpack and saw two guns, which the Defendant spontaneously told him were not real. The Defendant claimed ownership of the paintball gun and told him that the BB gun belonged to Mr. Ross. Officer Franklin also saw gloves on the center console armrest and on the backseat.

Officer Franklin testified that the Defendant told him that he did not live in the area but was there "to meet girls." The Defendant denied having been in the area earlier that day. The Defendant told Officer Franklin that Mr. Ross walked to a nearby Family Dollar store but came back immediately saying that the store was closed. However, Officer Franklin verified that the store was still open at that time. Officer Franklin also spoke to Mr. Ross about why he was in the area, and his story did not match the Defendant's. Officer Franklin did not recall finding any ski masks in the vehicle that night.

Ebori Bledsoe, an employee of Ace Cash Express, testified that she arrived to work around 7:30 a.m. on August 5, 2014, and the store was to open at 8:00. A tall young African-American man knocked on the door at 7:45, but she did not let him inside until the store opened. The man inquired about a title loan and stood by the window filling out an application. Ms. Bledsoe had her back turned away from the window as she continued completing her opening duties when she heard the door chime, indicating that someone had entered. She turned and saw that the person who had entered was wearing a mask and carrying a gun. The man demanded money, and Ms. Bledsoe dropped to the floor and pressed the panic button behind the counter. From where she was hiding under the counter, Ms. Bledsoe heard two men talking, speculating where Ms. Bledsoe had gone. She heard one man say, "I'm going to threaten you and see if that brings her out." The same man then said, "[I]f you don't come back up here by the time I count to three,

I'm going to shoot this guy in his head." Ms. Bledsoe did not move. She then heard the other man say, "[Y]ou need to go ahead and leave before the police come." Ms. Bledsoe got up after the police arrived and saw the surreptitious customer outside. The Saturn car he arrived in was still in front of the store. On cross-examination, Ms. Bledsoe stated that she heard the doorbell chime when the surreptitious customer entered and when the gunman entered. She did not see a third person enter the store and would have known if a third person had been inside. She only heard two distinct voices.

Officer Laquaria Price with the Memphis Police Department responded to the alarm call at Ace Cash Express. She arrived on the scene and was flagged down by Mr. Ross, who told her that both he and the business had been robbed. While she was investigating the scene, the Defendant and Mr. Howard appeared and explained that Mr. Ross had dropped them off at a friend's house near the business and was to pick them up when he finished obtaining his title loan. Officer Price searched the car that Mr. Ross arrived in, which she described as being gray, green, or blue in color and belonging to Mr. Ross's girlfriend. Inside the car, Officer Price found a black BB gun on the floorboard behind the driver's seat. On cross-examination, Officer Price said that Mr. Ross was arrested that day because they found marijuana in his car.

**Defendant's Proof**

Lelia Muhammad testified that the Defendant had been her boyfriend for seven years. She recalled that the Defendant worked at Dollar Tree during the summer of 2014 and never seemed to have money problems. She claimed that at one of the court dates, she heard her sister, Regina, tell her boyfriend, Mr. Ross, not to "take up for" the Defendant. She also claimed to have heard Mr. Ross tell Mr. Howard on several occasions that he would lie about the Defendant's involvement "to get [the Defendant] more time so they could have less time." On cross-examination, Ms. Muhammad admitted that she planned to marry the Defendant and would do anything for him. She acknowledged that she did not know what the Defendant was doing on July 29, 2014.

**404(b) Hearing**

Prior to trial, the trial court conducted a hearing on the State's motion to admit evidence pursuant to Rule 404(b) of the Tennessee Rules of Evidence concerning other "bad acts" by the Defendant, namely his involvement in the attempted robbery of Ace Cash Express on August 5, 2014, and his suspicious activities on Mary Jane Avenue on August 13, 2014.

The testimony of Ms. Bledsoe, Officer Price, Mr. Howard, Mr. Ross, and Officer Franklin was substantially similar to his or her trial testimony recounted above. A

relevant portion of Mr. Ross's testimony at the hearing regarding the Ace Cash Express robbery was that both the Defendant and Mr. Howard ran inside after receiving his cue and pretended to rob him, taking his phone and keys. He said that Mr. Howard held him, and the Defendant demanded money from the employee. With regard to the suspicious activities on Mary Jane Avenue, Mr. Ross testified that he and the Defendant were "plotting" to rob the nearby Family Dollar store. He suggested that they "should wait until the morning, like [they] did the first one," and the Defendant suggested that they could "catch them at night."

The relevant portion of Mr. Howard's testimony at the hearing regarding the Ace Cash Express robbery was that he and the Defendant both ran inside after receiving a cue from Mr. Ross. Mr. Howard elaborated that the Defendant grabbed Mr. Ross while Mr. Howard rummaged through Mr. Ross's pockets, taking his phone, wallet, and keys, and then banged on the window demanding money from the clerk.

After the conclusion of the proof, the State asked the trial court to admit proof of the Family Dollar and Ace Cash Express robbery plots to show identity, intent, motive, and guilty knowledge and said that the incidents were part of "the same contextual scheme and pattern." The court found that identity, mistake of fact, and motive were material issues in the case, along with corroboration of accomplice testimony, and that those material issues were "other than . . . conduct conforming with character traits." The court also found that the State had presented clear and convincing evidence that the other incidents had occurred. The court further found that the proof was very probative and that the probative value was not outweighed by the danger of unfair prejudice.

## ANALYSIS

On appeal, the Defendant argues the trial court erred in allowing testimony under 404(b) of the Tennessee Rules of Evidence concerning his involvement in an attempted robbery of one business and his suspicious activities on Mary Jane Avenue near another business.

Tennessee Rule of Evidence 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Other purposes" have been defined to include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. See State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004). Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. State v. Dotson, 450 S.W.3d 1, 76-77 (Tenn. 2014). The Defendant concedes that because the trial court substantially complied with the procedural requirements, its decision will only be reversed if it "applie[d] an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012).

## I. Other Bad Acts to Prove Identity

### A. Ace Cash Express

The Defendant argues that the trial court erred in allowing testimony concerning his involvement in the attempted robbery of Ace Cash Express on August 5, 2014, to show his identity because: (1) identity was not a material issue at trial; (2) the attempt was not sufficiently similar to the July 29, 2014, robbery of the Family Dollar store; (3) the State failed to present clear and convincing proof of the Ace Cash Express incident; and (4) the probative value of the evidence was outweighed by the danger of unfair prejudice.

### 1. Identity

The Defendant asserts that identity was not a material issue at trial. "If a defendant's identity is conclusively established by other proof at trial, then identity is no longer at issue and the evidence of the other crime should not be admitted." State v. Jones, 450 S.W.3d 866, 892 (Tenn. 2014). The Defendant asserts that the testimony of

his accomplices, Mr. Ross and Mr. Howard, helped conclusively establish his identity, that he was identified as being in possession of the proceeds of the robbery by Regina Muhammad, and that he was identified in a photograph with and visited in jail following his arrest by Vernicia Stamps, an employee of the Family Dollar store, who failed to report to work on time on the day of the robbery.

During its cross-examination of Mr. Ross, the defense sought to undermine Mr. Ross's credibility by inferring that Mr. Ross was testifying against the Defendant to protect his relative, Mr. Howard, and such undermining of credibility would have necessarily undermined the credibility of Mr. Ross's identification of the Defendant as a participant in the crime. It is illogical that the Defendant's attempt to undermine Mr. Ross's credibility at trial and then be allowed to say on appeal that Mr. Ross's credibility, including his identification of the Defendant, went unchallenged. Likewise, during its cross-examination of Mr. Howard, the defense sought to raise the inference that Mr. Howard was only testifying against the Defendant to receive favorable treatment from the State. The insinuation from the defense's cross-examination of these two individuals was that Mr. Ross and Mr. Howard were casting the blame on the Defendant in order to get a better deal from the State and protect Mr. Howard. This insinuation cast doubt on the Defendant's participation that the State needed to overcome. The Defendant placed identity at issue by challenging the proof of identity. See id. (The defendant placed identity at issue by challenging the proof that he committed the murders and by attempting to shift the blame to others.).

With regard to the Defendant's claim that Regina Muhammad's seeing him in possession of the proceeds of the robbery helped conclusively establish his identity, the defense sought to undermine Ms. Muhammad's credibility during cross-examination as it had with Mr. Ross and Mr. Howard. The State, thus, needed to overcome any doubts the defense raised about her identification of the Defendant as a participant in the robbery.

In addition, the circumstantial evidence of the Defendant's association with Vernicia Stamps was not enough to conclusively establish his identity in light of the doubts the defense sought to raise through its cross-examinations of Mr. Ross, Mr. Howard, and Ms. Muhammad. In fact, the Defendant's innocuous connections with Family Dollar by his and his mother's former employment could have explained his association with Ms. Stamps in the minds of some jurors. The State needed to overcome this possibility to cast this evidence in a non-innocent light.

Moreover, the defense sought to cast doubt on the Defendant's involvement through its cross-examination of the store manager, Kimberly Lewis, concerning her inability to identify anyone, as well as Lelia Muhammad's testimony that the Defendant

never seemed to have money problems and that she had overheard conversations calling into question the testimony of other witnesses.

In sum, the evidence did not establish the Defendant's identity so conclusively as to eliminate the issue as a jury question. See White v. State, 533 S.W.2d 735, 739 (Tenn. Crim. App. 1975).

## 2. Similarity

The Defendant asserts that the Ace Cash Express attempted robbery was not sufficiently similar to the July 29, 2014 robbery of the Family Dollar store to prove identity.

> When evidence that the defendant committed another crime is offered to prove his identity as the perpetrator of the crime on trial, the modus operandi of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged.

Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980). The evidence of the other crime does not need to be identical to the evidence of the charged offense, but the other crime evidence must bear a sufficient connection to the issue of identity so as to establish the defendant's commission of "signature crimes." Jones, 450 S.W.3d at 895. To be admissible as evidence of the defendant's identity, it is sufficient that the "methods used in committing the offenses . . . have 'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons.'" State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999) (quoting Harris v. State, 189 Tenn. 635, 227 S.W.2d 8, 11 (Tenn. 1950)). The test is not whether the evidence demonstrates that the defendant committed both crimes, but whether the defendant used a peculiar and distinctive method in committing the crimes. See Young v. State, 566 S.W.2d 895, 897 (Tenn. Crim. App. 1978).

In this case, we are unable to conclude that the Family Dollar robbery and the Ace Cash Express attempted robbery were sufficiently similar so as to constitute signature crimes. The use of a paintball gun in both incidents is simply not peculiar and distinctive enough for a reasonable person to "conclude that it would not likely be employed by different persons." See Moore, 6 S.W.3d at 240. Thus, it was error for the trial court to admit evidence of the Ace Cash Express attempted robbery to prove the Defendant's identity as the perpertrator of the crimes.

Despite our conclusion that the two incidents were not sufficiently similar to have probative value in proving the Defendant's identity, we will nevertheless address the remaining conditions for admission under Rule 404(b).

### 3. Clear and Convincing Proof

The Defendant asserts that the State failed to present clear and convincing proof of the Ace Cash Express incident. The clear and convincing standard requires that the evidence offered to show the defendant's involvement in the other crime is not "'vague and uncertain.'" State v. Fisher, 670 S.W.2d 232, 236 (Tenn. Crim. App. 1983) (quoting Wrather v. State, 179 Tenn. 666, 169 S.W.2d 854, 858 (1943)). The burden is on the State to establish by clear and convincing evidence that: (1) another crime was committed; and (2) the crime was committed by the defendant. White, 533 S.W.2d at 743 (citing Wrather, 169 S.W.2d at 858). "'Only thus can identification, or other proof of guilt, of the accused in the pending case be aided by evidence of the [other] crime.'" Id. (quoting Wrather, 169 S.W.2d at 858).

The gist of the Defendant's argument that the evidence of the Ace Cash Express incident was not clear and convincing is that the testimony of Ms. Bledsoe, the store employee, conflicted with the testimony of Mr. Ross and Mr. Howard, whose testimony conflicted with each other and was inconsistent from the Rule 404(b) hearing to the trial. Although the details of the accounts differ and even conflict at times, the discrepancies between the accounts were resolved by the trier of fact and are not so great as to render the evidence "vague and uncertain." We conclude that the trial court did not abuse its discretion by determining that the evidence of the Defendant's involvement in the Ace Cash Express attempted robbery was clear and convincing.

### 4. Probative Value/Prejudice

The Defendant asserts that the probative value of the Ace Cash Express attempted robbery was outweighed by the danger of unfair prejudice. He argues that the "striking differences in these crimes render any testimony about the Ace Cash incident quite limited in its probative value relative to its prejudicial effect."

Evidence of another crime must be excluded if the danger of unfair prejudice "outweigh[s]" the probative value. Tenn. R. Evid. 404(b)(4). "Unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997) (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). The concern of unfair prejudice must be balanced against the probative value of the proffered

evidence, which depends on the need for the evidence in light of the issues at trial and other evidence available to the State. Jones, 450 S.W.3d at 894-95.

> "The probative value of evidence of other crimes where the issue is identity depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense also committed the offense on trial. . . . The probative value of evidence of other crimes on the issue of identity always depends upon the strength of the inference; when the inference of identity is weak, evidence of prior crimes should be excluded because under such circumstances the prejudicial effect of the evidence inevitably outweighs the probative value of that evidence."

Bunch, 605 S.W.2d at 230 (quoting United States v. Powell, 587 F.2d 443, 448 (9th Cir. 1978)).

As discussed above, the Family Dollar robbery and the Ace Cash Express attempted robbery were not sufficiently similar to warrant an inference that the Defendant was involved in both crimes. The trial court abused its discretion in determining that the probative value of the Ace Cash Express incident on the issue of identity outweighed the danger of unfair prejudice.

### B. Activities on Mary Jane Avenue

The Defendant argues that the trial court erred in allowing testimony concerning his suspicious activities on Mary Jane Avenue near another business on August 13, 2014, because the incident was not sufficiently similar to the July 29, 2014 robbery of the Family Dollar store. The main similarities between the two incidents are the choice of weapon and choice of retail target, i.e., a Family Dollar store. Minor similarities between the two incidents are simply not compelling enough to establish the Defendant's commission of signature crimes. We, thus, conclude that the trial court abused its discretion in allowing evidence of the Defendant's suspicious activities on Mary Jane Avenue.

## C. Effect of Error

Despite our determination that the trial court improperly admitted evidence of the Ace Cash Express attempted robbery and the Defendant's suspicious activities on Mary Jane Avenue, we conclude that such error was harmless. Mr. Ross, Mr. Howard, and Regina Muhummad all implicated the Defendant with their testimony. Ms. Lewis' testimony corroborated Mr. Ross's and Mr. Howard's testimony about the course of the robbery. Surveillance video from the Family Dollar store corroborated the testimony of Mr. Ross, Mr. Howard, and Ms. Lewis. Ms. Lewis testified that the robbers appeared to be familiar with the store, and the proof showed that the Defendant himself, as well as a family member, had previously worked there. The proof also showed that Vernicia Stamps, who was the Defendant's first visitor in jail, was supposed to work at the Family Dollar the morning of the robbery but was late that day, an unusual occurrence for her. In light of this proof, we cannot conclude that the admission of other bad acts evidence more probably than not affected the judgment in this case. See Tenn. R. App. P. 36(b).

## II. Other Bad Acts to Prove Corroboration

The Defendant also argues that evidence of his involvement in the Ace Cash Express attempted robbery and suspicious activities on Mary Jane Avenue should not have been admitted for purposes of corroborating accomplice testimony. He asserts that corroboration of accomplice testimony is not an enumerated purpose for admitting other bad acts evidence and, even if it was, that the corroboration requirement could have easily been met with another witness's testimony.

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (citing State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). This principle has been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the

requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). The jury determines "the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient 'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" Anderson, 985 S.W.2d at 16 (quoting Clapp v. State, 30 S.W. 214, 217 (Tenn. 1895)).

The plain language of Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes," but it does not specify what constitutes "other purposes." Later, the rule requires that the "court must determine that a material issue exists other than conduct conforming with a character trait." Tenn. R. Evid. 404(b)(2). Again, the rule does not specify what the "material issue" must be, only that it cannot be conduct conforming with a character trait. The advisory commission comments to the rule enumerate some "issues such as identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," but the words "such as" suggest that the list is non-exhaustive and that the aforementioned issues were examples only. Tenn. R. Evid. 404, Advisory Comm'n Cmt. Moreover, Rule 404(b) is often viewed as a rule of exclusion, but several panels of this court have noted that "it may equally be viewed as a rule of inclusion, if the prior bad acts or crimes of the accused are admissible for purposes other than to prove character." See, e.g., State v. George Arthur Lee Smith, Nathaniel ("Nat") Allen, and Shannon Lee Jarnigan, No. E2006-00984-CCA-R3-CD, 2007 WL 4117603, at *30 (Tenn. Crim. App. Nov. 19, 2007), perm. app. denied (Tenn. Feb. 25, 2008); State v. Matthew Carfi, No. M2005-01467-CCA-R3-CD, 2006 WL 2788523, at *15 (Tenn. Crim. App. Sept. 29, 2006), perm. app. denied (Tenn. Mar. 5, 2007); State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003), perm. app. denied (Tenn. Apr. 28, 2003). In sum, there are many indicators that there is not an exhaustive list of permissible purposes for the admission of other bad acts evidence, as long as the admission of the other bad acts is not directed at establishing propensity.

The Defendant insists that the corroboration requirement could have easily been met with another witness's testimony, namely Regina Muhammad. Regina Muhammad's testimony could have been used to corroborate the accomplice testimony, but that does not prevent the State from presenting additional testimony in corroboration, particularly because the defense tried to damage the corroborative value of Ms. Muhammad's testimony by trying to undermine her credibility.

Regardless, even if the admission of the other bad acts to corroborate accomplice testimony was error, such error was harmless because the proof against the Defendant was strong.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE