IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2018 Session

## STATE OF TENNESSEE v. JOHN ORISE ADAMS III

**Appeal from the Criminal Court for Putnam County**
**No. 2014-CR-674     Gary S. McKenzie, Judge**

_____

### No. M2017-02169-CCA-R3-CD
_____

The Defendant, John Orise Adams III, was convicted by a jury of one count of aggravated robbery, a Class B felony. See Tenn. Code Ann. § 39-13-402. The trial court then imposed an eight-year sentence. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain the Defendant's conviction; (2) that the trial court erred in admitting evidence of the Defendant's drug use; (3) that the trial court erred in allowing a witness to testify that the Defendant was "aware" of certain events prior to the robbery because the witness could not have had personal knowledge of what the Defendant was "aware" of; and (4) that the cumulative effect of these errors denied the Defendant a fair trial. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Craig P. Fickling, District Public Defender; Benjamin D. Marsee, Assistant District Public Defender (on appeal); and Albert Fitzpatrick Officer III, Cookeville, Tennessee (at trial), for the appellant, John Orise Adams III.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Bret Thomas Gunn and Beth Elana Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On the night of June 11, 2014, Samantha Porter was working as a clerk at the "Burgess Falls Shell station." The store was empty, and Ms. Porter had gone to "the back

room" to get some cleaning supplies when she heard someone enter the store. As she approached the front of the store, Ms. Porter saw a man with "pantyhose" covering his face and holding what appeared to be a gun. The man pointed the "gun" at Ms. Porter and said that "he wanted the money."

Ms. Porter testified that she believed the "gun" was real and that she was scared. Ms. Porter explained that she "did what he told [her] to do" and opened the cash register. The man leaned "over [the counter] and grabb[ed] the money out" of the cash register. Ms. Porter estimated that the man took $100. The man then "took off," and Ms. Porter, "scared" and "crying," called 911. A recording of the robbery taken from the store's video surveillance system was played for the jury at trial.

The responding officers found Ms. Porter "crying, very upset, [and] not making a lot of sense." Ms. Porter was able to tell the officers that she had been robbed, that the robber "ran on foot," and that the robber "went around the corner of the building." A canine unit searched the area around the store. At a car wash near the store, the dog "lifted his head and started running in circles." This suggested to the dog's handler that the robber had gotten "in a vehicle" and left "the area without walking."

The officers also reviewed video footage from the surveillance system of a Ford dealership located behind the store. The footage showed a green car driving through the dealership, parking near a dumpster, and then driving away shortly before the time of the robbery. The Defendant was known to drive a green Ford Contour with an Indiana license plate.

Co-defendant Jordan Adcock testified that he, co-defendant Ean Adkins, and the Defendant planned and carried out the robbery of the Burgess Falls Shell station on June 11, 2014. Co-defendant Adcock testified that he and co-defendant Adkins had been stopped by the police earlier that day, but that they eventually made their way to the home of Casey Robinson. Co-defendant Adcock explained that he had been staying with Mr. Robinson in June 2014 and that co-defendant Adkins "was hanging out there" as well.

Co-defendant Adcock recalled that the Defendant was at Mr. Robinson's house when he and co-defendant Adkins arrived there that day. Co-defendant Adcock explained that Mr. Robinson was dating the Defendant's sister at that time. According to co-defendant Adcock, the Defendant and Mr. Robinson were playing video games and smoking marijuana when he and co-defendant Adkins showed up at Mr. Robinson's house.

Co-defendant Adcock testified that Mr. Robinson allowed marijuana to be used at his house, but not cocaine. Co-defendant Adcock admitted that he and co-defendant

Adkins brought cocaine with them to Mr. Robinson's house that day. At some point, Mr. Robinson went to sleep, and co-defendants Adcock and Adkins began to use the cocaine they had brought with them. Co-defendant Adcock testified that the Defendant joined them in using the cocaine.

About an hour before the robbery, the men ran out of cocaine. Co-defendant Adcock testified that it was at this point that co-defendant Adkins came up with the idea to rob a store in order to get the money they needed to buy more cocaine. Co-defendant Adcock and the Defendant initially thought "it was a joke" and "didn't believe" that "it was going to happen." However, co-defendant Adcock admitted that he and the Defendant "did proceed to do it." Co-defendant Adcock explained that he and the Defendant participated in the planning of the robbery with co-defendant Adkins.

The men got in the Defendant's green Ford Contour, and the Defendant drove them to a nearby Walmart. Co-defendant Adcock and co-defendant Adkins went inside the Walmart where co-defendant Adkins stole a toy gun to be used in the robbery. They returned to the Defendant's car, and the three men then went to a Dollar General. Co-defendant Adkins went inside the Dollar General and stole a pair of pantyhose that was also to be used in the robbery.

The Defendant and the co-defendants then drove around looking for a store to rob. Co-defendant Adcock testified that they chose the Burgess Falls Shell station because they did not see any customers at the store. The men drove around the store to make sure that there were no customers and then parked at the car wash near the store. It was decided that co-defendant Adkins would go into the store because co-defendant Adcock and the Defendant did not want to.

According to co-defendant Adcock, co-defendant Adkins put the pantyhose on his head, took the toy gun, and went inside the store. Co-defendant Adcock estimated that co-defendant Adkins was in the store for a minute or two. Co-defendant Adkins had approximately $100 when he returned to the Defendant's car. The Defendant then drove the co-defendants to purchase more cocaine. Co-defendant Adcock testified that he, co-defendant Adkins, and the Defendant all used the cocaine purchased with the proceeds of the robbery.

Co-defendant Adcock was arrested several days after the robbery on an unrelated probation violation. Co-defendant Adcock admitted that he was with the Defendant in the Defendant's car when he was arrested. Co-defendant Adcock told investigators about his involvement in the robbery along with the involvement of co-defendant Adkins and the Defendant.

-3-

Co-defendant Adcock admitted that he "knew what was going to happen" and intended for the robbery to occur. Co-defendant Adcock testified that the Defendant was awake and could see co-defendant Adkins go inside the store. Co-defendant Adcock insisted that the Defendant was present and participated in the planning for the robbery. Co-defendant Adcock further testified that the Defendant drove everywhere that night and was present and "aware" for all of the preparations leading up to the robbery.

Co-defendant Adcock's robbery charge was still pending at the time of the Defendant's trial. Co-defendant Adcock testified that he had received no promises from the prosecutor in exchange for his testimony. However, co-defendant Adcock admitted that the prosecutor had agreed to take his trial testimony into consideration when deciding on a plea offer. Co-defendant Adcock insisted that he would have testified regardless of any offers from the State.

Co-defendant Adkins also testified at trial, having already pled guilty to aggravated robbery. Co-defendant Adkins did not want to testify at trial because what he told the investigators "was enough already" and he "shouldn't have brought them two down with" him. Co-defendant Adkins claimed that robbing the store "was [his] idea" alone. According to co-defendant Adkins, the Defendant "was just riding along." Co-defendant Adkins admitted that co-defendant Adcock and the Defendant were in the car when he robbed the store. When asked if they knew what he was doing, co-defendant Adkins responded, "That's on them." Co-defendant Adkins also claimed that the Defendant did not share in the proceeds of the robbery.

Co-defendant Adkins admitted that he gave a statement to investigators before anyone was charged with the robbery. In that statement, co-defendant Adkins told the investigators that co-defendant Adcock and the Defendant "conspired with [him] and committed [the] robbery." Co-defendant Adkins stated that the three of them were at Mr. Robinson's house "under the influence," they "were all broke," "and wanting to get high" when they planned the robbery. Co-defendant Adkins also stated that they divided the money amongst the three of them and bought cocaine with it.

Co-defendant Adkins insisted that his testimony at trial was truthful and that he had lied in his statement to the police. Co-defendant Adkins claimed that he thought the State would help him get transferred to a different facility when he gave his statement, but that never happened.

Co-defendant Adkins admitted that the Defendant drove him to the Burgess Falls Shell station. Co-defendant Adkins also admitted that he was wearing the Defendant's coat when he robbed the station, but he claimed that he had taken the coat from the Defendant. Several days after the robbery, co-defendant Adkins threw the coat out on the side of the road because pictures of the robbery taken from the store's surveillance

system had been on the local news. Co-defendant Adkins told investigators where he had dumped the coat, and they were able to eventually recover it.

Mr. Robinson testified that in June 2014, the Defendant was staying with him and that co-defendants Adcock and Adkins stayed at his house "a couple of nights." The Defendant and the co-defendants got to know each other "[p]retty good" during this time. Mr. Robinson testified that he and the defendants smoked marijuana on the day of the robbery. However, Mr. Robinson insisted that he did not allow other drugs in his home and that he had never known the Defendant to use cocaine.

Mr. Robinson testified that he was not at the house when the Defendant and the co-defendants left on the night of June 11, 2014. According to Mr. Robinson, he was asleep when the men returned and woke him. Mr. Robinson initially told the investigators that the Defendant and the co-defendants all "confessed that they had robbed the store." The next day, Mr. Robinson told the Defendant and the co-defendants that they needed to leave his house. Mr. Robinson also found a plastic toy gun in his garbage can sometime after the robbery.

Approximately a month before the Defendant's trial, Mr. Robinson told the prosecutor that his statement to the police was true. However, Mr. Robinson claimed at trial that "[t]hinking back . . . about it," only co-defendants Adcock and Adkins "admitted to [him]" that they participated in the robbery. Mr. Robinson further claimed that co-defendant Adkins told him that co-defendant Adcock "and them" had robbed the store and that the Defendant sat on a couch and was "super quiet" while co-defendant Adkins confessed to the robbery. Mr. Robinson testified that co-defendants Adkins and Adcock had cocaine with them that night, but that he would not let them use it at his house.

Mr. Robinson admitted that he and the Defendant were "good buddies." Mr. Robinson further admitted that he had been in contact with the Defendant prior to trial. In fact, the Defendant had driven Mr. Robinson to the courthouse the morning of the trial. The investigator who took Mr. Robinson's statement testified that Mr. Robinson's testimony was different from what he had previously told the investigator.

Based upon the foregoing, the jury convicted the Defendant of aggravated robbery. Following a sentencing hearing, the trial court imposed an eight-year sentence. This appeal followed.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The Defendant contends that the evidence was insufficient to sustain his conviction for aggravated robbery. There is no dispute that co-defendant Adkins entered the Burgess Falls Shell station with a toy gun, pointed the toy gun at Ms. Porter, demanded that she open the cash register, and took approximately $100 from the cash register, which was then used to purchase cocaine. Instead, the Defendant argues that the State failed to prove that he was criminally responsible for co-defendant Adkins's conduct. Specifically, the Defendant argues that the State failed to prove that he "had the 'conscious objective or desire' to rob the Shell station." The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>State v. Dorantes</u>, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

As pertinent to our review, aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1). The jury was also charged on criminal responsibility for the conduct of another. As charged to the jury, a defendant is criminally responsible for an offense committed by the conduct of another if the defendant "solicits, directs, aids, or attempts to aid another person to commit the offense" while "[a]cting with [the] intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2).

The evidence at trial, viewed in the light most favorable to the State, established that the Defendant and co-defendants Adcock and Adkins had been using cocaine at Mr. Robinson's house on the night of June 11, 2014. When they ran out of cocaine, co-defendant Adkins suggested that they rob a store to get some money to buy more cocaine. While co-defendant Adcock testified that he and the Defendant initially thought that co-defendant Adkins was joking, co-defendant Adcock admitted that he and the Defendant participated in planning the robbery. The three men then got in the Defendant's car, and the Defendant drove them to a nearby Walmart and Dollar General where co-defendant Adkins stole the toy gun and pantyhose he would use in the robbery.

The Defendant drove to the Burgess Falls Shell station and drove around the store, including through the Ford dealership located behind the store, to ensure that there were no customers. The Defendant parked the car at a nearby car wash. Co-defendant Adkins put the pantyhose on his head, took the toy gun, and went inside the store. When he returned a few minutes later, co-defendant Adkins had approximately $100. The Defendant drove the co-defendants to purchase more cocaine and then back to Mr. Robinson's house. This evidence was sufficient to establish that the Defendant aided in co-defendant Adkins's commission of the aggravated robbery with either the intent to assist the commission of the offense or to benefit in the proceeds of the offense.

Additionally, the Defendant suggests that the testimony of co-defendant Adkins and Mr. Robinson, while being inconsistent with their prior statements to the police, should have outweighed co-defendant Adcock's testimony. As noted earlier, this court does not reweigh the evidence. See Sheffield, 676 S.W.2d at 547; Cabbage, 571 S.W.2d at 835. Furthermore, questions regarding the credibility of the witnesses and the weight and value to be given to evidence are the province of the jury. See Bland, 958 S.W.2d at 659. Here, the jury chose to accredit the testimony of co-defendant Adcock over that of co-defendant Adkins and Mr. Robinson, and that fact alone "does not cause its verdict to be suspect." State v. Leath, 461 S.W.3d 73, 104 (Tenn. Crim. App. 2013). As such, we

will not disturb that determination on appeal. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for aggravated robbery.

## II. Evidentiary Issues

The Defendant contends that the trial court erred in admitting evidence of the Defendant's drug use. The Defendant argues that his drug use was not established by clear and convincing evidence and that the probative value of the evidence was outweighed by the danger of unfair prejudice. The Defendant also contends that the trial court erred in allowing co-defendant Adcock to testify that the Defendant was "aware" of co-defendant Adkins's preparations for the robbery because co-defendant Adcock could not have had personal knowledge of what the Defendant was "aware" of. The Defendant further contends that the cumulative effect of these errors denied him a fair trial. The State responds that the Defendant has waived plenary review of these issues by failing to file a timely motion for new trial and that there is no plain error.

## A. Waiver

Following the Defendant's sentencing hearing, several status hearings were scheduled regarding the Defendant's motion for new trial.[1] At some point, the Defendant's trial counsel was allowed to withdraw from his representation of the Defendant. Appellate counsel was appointed to represent the Defendant and filed an amended motion for new trial. At that time, it was discovered that trial counsel never filed an original motion for new trial.

The Defendant then filed a petition for post-conviction relief seeking, among other issues raised, a delayed motion for new trial. The trial court granted the Defendant "a delayed appeal" and stayed his remaining post-conviction issues. However, the Defendant did not file a motion for new trial. Likewise, there is nothing in the record reflecting that the trial court disposed of a motion for new trial filed by the Defendant. Instead, the Defendant filed a notice of appeal to this court.

The thirty-day time limit for filing a motion for new trial is jurisdictional, and an untimely motion for new trial "is a nullity." State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Failure to file a timely motion for new trial waives plenary review of all issues "except for sufficiency of [the] evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004). When "no motion for new trial was filed in the original proceeding," a trial court may grant post-conviction relief and "authorize a

---

[1] We note that our review is hampered by the fact that the record contains no transcripts for the sentencing hearing, any of the status or motion for new trial hearings, or the Defendant's subsequent post-conviction hearing.

-8-

motion to be made before the original trial court within thirty . . . days." Tenn. Code Ann. § 40-30-113(a)(3). This delayed motion for new trial "shall be disposed of by the original trial court." Id.

Here, trial counsel failed to file a timely motion for new trial. As such, the Defendant's amended motion for new trial was a nullity. The trial court granted the Defendant post-conviction relief to file "a delayed appeal" and stayed the Defendant's remaining post-conviction issues. However, the Defendant did not file a motion for new trial within the thirty-day time limit, and the trial court never disposed of such a motion. Instead, the Defendant filed a notice of appeal to this court. Therefore, the Defendant has waived plenary review of his evidentiary issues, and we will review them solely for plain error.

### B. Plain Error Review

The doctrine of plain error applies when all five of the following elements have been established:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). A defendant's failure to establish any of these criteria requires denial of relief under the plain error doctrine, and "an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Id. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006). Moreover, we note that "rarely will plain error review extend to an evidentiary issue." State v. Jonathan Mitchell Grimes, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)).

### C. Evidence of the Defendant's Drug Use

Prior to trial, the Defendant filed a motion in limine seeking to exclude evidence of any other "crimes, wrongs, or acts." The trial court addressed the Defendant's motion just before jury selection. The prosecutor asserted that he did not "anticipate any testimony in regards to any other crimes or wrong acts" except for testimony regarding the Defendant's drug use before and after the robbery.

The prosecutor explained that he expected the co-defendants to testify that the robbery was committed because they needed "money to purchase drugs" and that after the robbery, "they went and spent [the money] on drugs and used those drugs." The prosecutor argued that this was highly probative evidence of the Defendant's motive to participate in the robbery and his benefiting from the proceeds of the robbery.

Trial counsel "stipulated" that there would "be some . . . testimony . . . [that] the reason for [the] robbery was to obtain money for drug use." Trial counsel stated that "both of the co-defendants [were] probably going to say that[,] . . . [o]r at least one of them."

The trial court then analyzed this issue using Tennessee Rule of Evidence 404(b). At the outset, the trial court stated that the State and the Defendant had "stipulated" as to what the evidence would be, so there was no "need to actually call [a] live witness." The trial court concluded that a material issue other than conduct conforming with a character trait existed. The trial court stated that the evidence established the Defendant's motive for participating in the robbery and showed that he benefitted from the proceeds of the robbery. The trial court concluded that the evidence was clear and convincing because they had "sort of a stipulation." Finally, the trial court concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

Based on the foregoing, the Defendant has failed to show that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

Rule 404(b) requires the court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of another bad act, the trial court must consider the following three elements: (1) whether a material issue other than conduct conforming with a character trait exists supporting admission of the other act; (2) whether proof of the other act is clear and convincing; and (3) whether the danger of unfair prejudice is outweighed by the probative value of the evidence. Tenn. R. Evid. 404(b)(2)-(4). The trial court followed this procedure and concluded that all three elements had been satisfied.

The Defendant's chief complaint is that witnesses should have been presented at the jury-out hearing because a stipulation by the parties could not satisfy the requirement that there was clear and convincing proof of his drug use. "The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." State v. Jones, 450 S.W.3d 866, 893 (Tenn. 2014) (alteration in original) (internal quotation marks omitted) (quoting State v. Kennedy, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004)). Put another way, the clear and convincing standard ensures that the proof of the other bad act "is not vague and uncertain." Id. (internal quotation marks omitted) (quoting State v. Fisher, 670 S.W.2d 232, 236 (Tenn. Crim. App. 1983)).

The State bears the burden to prove that another bad act was committed and that it was committed by the defendant. Jones, 450 S.W.3d at 893. However, this "may be established exclusively by circumstantial evidence." Id. On appeal, this court "may not substitute our own inferences for those drawn by the trial court, which acted as the finder of fact in determining whether the proof . . . was clear and convincing." Id. Here, the prosecutor and trial counsel agreed that at least one of the co-defendants would testify about the Defendant's drug use before and after the robbery.[2] The Defendant cites to no authority, and we are aware of none, that Rule 404(b) requires witnesses to be called at the jury-out hearing and that the parties cannot stipulate to what the evidence of the other bad act would be. Accordingly, the Defendant has failed to establish that a clear and unequivocal rule of law was breached.

Similarly, the Defendant has failed to establish that a clear and unequivocal rule of law was breached by the trial court's finding that the probative value of the evidence outweighed the danger of unfair evidence. Here, the evidence of the Defendant's drug use was limited to immediately before and after the robbery. The evidence was highly relevant to establish the Defendant's motive for committing the offense and to show that the Defendant intended to benefit, and ultimately did benefit, from the proceeds of the robbery. See State v. Cory Shane Rollins, No. E2008-01407-CCA-R3-CD, 2010 WL 342653, at *9 (Tenn. Crim. App. Feb. 1, 2010) (reaching the same conclusion under similar circumstances). Accordingly, the Defendant has not established plain error in the trial court's admission of evidence of the Defendant's drug use.

### D. Personal Knowledge of the Defendant's "Awareness"

---

[2] The Defendant also cites to Mr. Robinson's trial testimony that he had never known the Defendant to use cocaine and the fact that co-defendant Adkins did not testify at trial about the Defendant's cocaine use to support his argument that the State failed to satisfy Rule 404(b)'s requirement of clear and convincing proof of the other bad act. However, our review of this issue is limited to the evidence presented at the jury-out hearing. See Jones, 450 S.W.3d at 894 n.6.

During cross-examination, trial counsel asked co-defendant Adcock if the Defendant "thought [the robbery] was going to happen." On re-direct examination, the prosecutor asked co-defendant Adcock if "it was [his] intent that [the robbery] happen." Co-defendant Adcock responded that it was. The prosecutor then asked if "it was [the Defendant's intent that it happen," and trial counsel objected that co-defendant Adcock lacked personal knowledge of the Defendant's "intent." The trial court sustained the objection.

The prosecutor next asked if the Defendant was "present and participat[ed]" in the planning of the robbery. Co-defendant Adcock responded that the Defendant was. The prosecutor asked if the Defendant was present and "aware" during the various preparations for the robbery and when co-defendant Adkins entered the store. Trial counsel again objected, arguing that co-defendant Adcock lacked personal knowledge of what the Defendant was "aware" of. The trial court overruled the objection and co-defendant Adcock responded that the Defendant was present and "aware" for all of the preparations and when co-defendant Adkins entered the store.

Based on the foregoing, the Defendant has failed to show that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The "[e]vidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Tenn. R. Evid. 602. A witness's testimony "may not be based on mere speculation," but Rule 602 "does not require absolute certainty." State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000) (internal quotation marks omitted).

The Defendant has cited no legal authority supporting his argument that co-defendant Adcock, who was in the car with the Defendant and observed the Defendant during the time leading up to the robbery, lacked the required personal knowledge to opine that the Defendant was "aware" of the events leading up to the robbery. Because no clear and unequivocal rule of law was breached, the Defendant has failed to establish that the trial court's admission of co-defendant Adcock's testimony was plain error.

### E. Cumulative Error

The Defendant contends that the cumulative effective of the trial court's alleged evidentiary errors requires a new trial. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the

-12-

cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77. Here, our review is limited to plain error and the Defendant has failed to establish plain error with respect to either of his evidentiary issues. Accordingly, there can be no cumulative error in the absence of any error.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE